Dylan D. Routh
C. Renée Manes
4928 SE Tibbetts
Portland, OR 97206
Phone: 503-281-7723
email: dylandrouth@hotmail.com
email: renee.manes@gmail.com
Plaintiffs in *pro se*



# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF NEW YORK

### ROCHESTER DIVISION

|  |  |
|---|---|
| DYLAN ROUTH and  C. RENÉE MANES,<br><br>    Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF ROCHESTER, SARAH HULBERT (as staff member of the University of Rochester), and SARAH HULBERT (individually),<br><br>    Defendants. | CV 11-6606 S<br><br>**AFFIDAVIT OF C. RENÉE MANES** |

STATE OF OREGON  )
         ) ss.
County of Multnomah  )

  1.  My name is C. Renée Manes, and I am one of the Plaintiffs in this matter.

  2.  The fact that I am an attorney has been known to all of the parties for quite some time – if not the entire time of my son's enrollment at the University of

         **AFFIDAVIT OF C. RENÉE MANES**

Rochester. We entered my employment on his application, and I have made my status known to the University of Rochester's administrators as well as their lawyers on several occasions. I am not admitted to the practice of law in New York, nor before this Court, and I am therefore obligated to litigate this matter *pro se* with my son until we retain counsel.

3.      This is not the only litigation between the parties. Shortly after filing her complaint with the University, Ms. Hulbert filed a criminal complaint and we were contacted by Detective John Fiorica. I explained to Detective Fiorica that the complaint was retaliatory and based on Ms. Hulbert's anger that Mr. Routh refused to see her any further. I suggested that he obtain all material from the University of Rochester. Detective Fiorica informed me that he was able to obtain all material but the tape of the hearing and the non-party student witness statements. That was in September, and since then there has been no indication that there is any intent to pursue criminal charges. I retained the law firm of Trevett Cristo Salzer & Andolina, P.C., to represent my son in that matter, and they inform me that at this time there is not likely to be any criminal action.

4.      Even though there has been no personal contact with Ms. Hulbert since September 16, 2011, and Dylan has been in Portland since the beginning of October, Ms. Hulbert has also filed for a domestic violence restraining order against Dylan, in *Hulbert v. Routh*, Monroe County Court O-12509-11, File No. 75442. The law firm of Trevett Cristo Salzer & Andolina, P.C., represents Dylan in that matter, and we will

be factually contesting the allegations. My understanding is that they will shortly be undertaking discovery, including depositions of individuals such as Ms. Hulbert.

5.     I have not retained a lawyer in this matter, as I am aware from my practice that once a personal injury attorney becomes involved the litigation is often pursued primarily to maximize recovery. I have always believed that this is a personal matter best suited to mediation. I suggested mediation to the University, specifically Dean Lennie, but received no response. I suggested mediation to the first lawyer for Ms. Hulbert who contacted us, Ms. Mary Jo Korona, but received no response other than a copy of a letter filed with this Court. I suggested mediation again to the University's lawyer, Mr. Kurland, but was met with absolute hostility. Even my suggestion to Mr. Kurland that the parties ask the Court if we could avoid the obligations of Local Rule 5-2(f), for the public filing of discovery, was met with a very hostile response. To date there has been no willingness of the defendants to resolve this matter other than through the courts, and that is why we have filed suit.

6.     Even though I am willing to mediate this matter, that is not because I do not believe in the strength of our causes of action. I believe any independent review of the record will conclude that Ms. Hulbert's filing against Dylan were wholly retaliatory for his refusal to see her, and the University's actions were not only based on a gender-based bias against male students but were in violation of numerous policies and procedures adopted by the University – policies that we relied on when

**AFFIDAVIT OF C. RENÉE MANES**

we elected to have Dylan attend the University and agreed to pay (and paid) significant sums of money to that school. We will be seeking discovery to prove our case, and will seek to obtain a copy of the entire record of the disciplinary proceedings against Dylan Routh. To date the University has refused to allow us to have a copy of the vast majority of the documents, and has only allowed us to briefly review them.

7.    Attached as Exhibit A is a copy of a document entitled "Policy 106 Investigation Findings of Fact" that is dated January 24, 2012. We received this two days after the University's lawyers filed their motion to dismiss. The document purports to analyze our discrimination claims against the University. For the first time, and contrary to explicit statements made to us by Dean Levy, the document contends that Dylan was not expelled for his conduct with Ms. Hulbert alone, but only because he also had some prior disciplinary activity. We contend that any such prior activity is minor, at best. I am astonished that on one hand the University can claim that Dylan's conduct with Ms. Hulbert amounted to sexual assault, but now also say that they would not have expelled him for such conduct alone. We will certainly seek to conduct extensive discovery on the validity of these conclusions and the factual allegations made in this document.

8.    Finally, on a personal level, I would note that on the precise same day as I obtained the University's motion, I also received the mail provided as Exhibit B

**AFFIDAVIT OF C. RENÉE MANES**

– a request that I purchase a senior year book for my son from the University of Rochester. Over the last four months, I have received mail from the University almost every week asking me to purchase something, or donate to some parent's fund, because I am parent of a student at the University of Rochester. This whole situation has been quite traumatizing and I continue to be re-offended by every piece of mail I receive from the University on these issues.

8. I make this motion in good faith and not for the purpose of delay.



C. Renée Manes

SUBSCRIBED AND SWORN TO BEFORE ME this February 7, 2012.

Notary Public for Oregon

OFFICIAL SEAL
**CHRISTINE T MOORE**
NOTARY PUBLIC-OREGON
COMMISSION NO. 426421
MY COMMISSION EXPIRES MARCH 31, 2012

**AFFIDAVIT OF C. RENÉE MANES**

## CERTIFICATE OF SERVICE

The undersigned swear that the foregoing was served on the following counsel

for the parties both by e-mail to the e-mail addressed of record and by placing a copy,

postage pre-paid, in the United States mail and addressed as follows:

Paul L. Leclair
Jeremy M. Sher
Leclair, Korona, Giordano, Cole,
LLP
150 State Street, Suite 300
Rochester, NY 14614

email:
pleclair@leclairkoronoa.com;
jsher@leclairkorona.com

Harold Kurland
Ward, Greenberg, Heller & Reidy LLP
300 State Street
Rochester, NY 14614

email:
hkurland@wardgreenberg.com

RESPECTFULLY SUBMITTED this February 7, 2012.

Dylan D. Routh

C. Renée Manes

**AFFIDAVIT OF C. RENÉE MANES**

# EXHIBIT A

# POLICY 106 INVESTIGATION: FINDINGS OF FACT

> **Complainant:** Dylan Routh
> **Date of Complaint:** November 13, 2011
> **Investigator:** Jill K. Schultz
> **Date of Report:** January 24, 2012

## INTRODUCTION

This Report is based on interviews with the witnesses listed below. My typed notes of the interviews were provided to each witness, who had the opportunity to make edits and additions.* The typed interview notes, as edited by the witnesses, as well as the original handwritten notes, and the various documents gathered and reviewed in the course of this investigation support the findings made in this Report and have all been forwarded for recordkeeping to the Office of Counsel.

## WITNESSES INTERVIEWED

1. Dylan Routh, Complainant

2. Renée Manes, Complainant's mother

3. Dean Morgan Levy, Assistant Dean of Students

4. Dean Peter Lennie, Vice President and Dean of the Faculty of Arts, Sciences, and Engineering

5. Richard S. Crummins, Senior Counsel

6. Sean Hanna, Dean of Sophomores and Associate Director for Academic Support

7. Jessica Ecock, Assistant Director, Center for Student Conflict Management

1

## THE COMPLAINT

On November 13, 2011, Dylan Routh ("Routh") filed a Policy 106 Complaint ("Complaint") against the University of Rochester ("University"). Routh filed the Complaint via an email from his mother, Renée Manes ("Manes"). Routh was a student at the University. Routh's Complaint alleges: (1) Dean Morgan Levy ("Levy") lied to Routh and Manes about Routh's ability to file a cross-complaint against Sarah Hulbert ("Hulbert"); and (2) Levy's motivation to lie was based on illegal gender discrimination.

## *LACK OF PARTICIPATION BY THE COMPLAINANT(S)

On December 2, 2011, I conducted a telephone interview of Manes. Manes was generally cooperative and answered my questions (the interview lasted about one hour). As with all witnesses, I then sent Manes my typewritten interview notes and asked her to send me a reply email indicating that she either approved my notes or had suggested changes. I told her if she had any changes to make them directly to the notes (they were in Microsoft Word format) and send them back to me. I also invited her to send me any documents she wanted me to review as part of my investigation of the Complaint (we discussed this during the interview). As of this date, I have not received a response to my email with the interview notes.

Thereafter, on December 19, 2011, I was scheduled to conduct my telephone interview of Routh. Routh and I talked briefly on the phone several days earlier and set up the specific date and time for the phone interview. However, on December 19, 2011, Routh refused to participate in the interview. When I began to explain who I was and why I was conducting the investigation he became extremely argumentative. He said he received a letter from the University stating that "all matters have been decided" and asked "why should I talk to you?"

2

I explained that he and his mother filed a Complaint and the Complaint and investigation were separate from matters the University had already decided. Then he said he needed to get off the phone and would call me back in a couple of minutes. Thereafter, he called me back and said he has been "instructed by his attorney not to talk to me now." I told him it was likely that I would still proceed with the investigation and write a Report, and that if he did not participate it would be unfortunate if I did not have the benefit of his input and his side of the story. He said "okay."

Thereafter, I wrote an email (dated December 20, 2011) to Manes explaining that I was retained by the University to conduct an independent investigation of the Complaint that Manes/Routh brought against Dean Levy. The reason the University was conducting the investigation was because Manes/Routh asked the University to do so. I explained the issues in the Complaint and why the University saw the issues as separate from those that the University already decided. I asked Manes to send me an email and let me know if she wanted me to continue with my investigation of her/Routh's Complaint. I also stated that if she asked me to continue, I urged Manes and Routh to participate in the investigation so that I would have the benefit of their input. That participation included Manes sending back my interview notes and allowing Routh to participate in an interview.

Manes wrote me back an email (dated December 22, 2011) stating that Dean Lennie's decision rendered my investigation moot and indicating they planned to proceed with litigation.

After discussion with the University's Office of Counsel, we decided not to engaged in further email debate on this topic with Manes, but to conclude the investigation and write a Report based on the interviews and other factual evidence (documents) available to me.

3

## BRIEF SUMMARY

1.      Routh alleges Levy lied to Routh and Manes about Routh's ability to file a cross-

complaint against Hulbert.  My investigation did not find any factual basis to support this claim.

2.      Routh also alleges that Levy's motivation to lie was based on illegal gender

discrimination.  My investigation did not find any factual basis to support his claim.

## FACTUAL FINDINGS

### 1.      Background

Levy is the Judicial Officer for the University.  Her duties involve working with students

who are accused of violating the University's "Standards of Student Conduct" (also known as

the "Code").  Levy described the process as generally:  receiving a report (which may allege

inappropriate behavior), reviewing it, deciding whether she believes there is a violation of the

Code, calling in the accused student, and then determining how to proceed.  She has a wide

variety of options including:  dismissal, referral to an alternative dispute resolution process (like

mediation), deferral pending dismissal, and/or charging the student with violating the Code.[1]

---

[1] Levy's description of the process and her extensive discretion in handling reports of misconduct are supported by
the Code.  The Code ("The Conduct Process," p.3) states:

> The judicial officer will review the complaint and relevant documentation in order to determine
> whether or not there is sufficient cause to initiate disciplinary proceedings or pursue alternative
> means for resolution.  Possible resolution options are as follows:
>> a. Dismiss the complaint.
>> b. Decide that the complaint can be processed through informal means of
>> resolution, such as mediation.  *For more information about mediation please*
>> *contact the Center for Student Conflict Management at 585-275-4085.*
>> c. Defer the case pending dismissal.  Deferment periods are generally not
>> expected to last more than one semester.
>> d. Decide that the complaint contains grounds to reasonably believe that the
>> University's policies, rules, or regulations have been violated and charge the
>> student, on behalf of the University, accordingly.  If this action is taken, several
>> procedures are possible, as explained below.

4

With regard to the current matter, the process began when Hulbert made a complaint by meeting in person with Jessica Ecock ("Ecock") (Assistant Director, Center for Student Conflict Management), and then placing her complaint in writing and giving it to University Security and Levy's office. Hulbert named Routh as the respondent. Levy then met with Routh and decided to interim suspend Routh based on Hulbert's complaint and Routh's prior disciplinary history at the University. Routh's prior disciplinary history included knife possession, multiple drug and alcohol issues, and disorderly conduct. Levy considered Routh's weapons possession to be significant in her decision to interim suspend Routh.

Levy provided me with a summary of background details of Routh's conduct that impacted on her decision regarding how to proceed. Most significantly, Hulbert alleged (and Routh admitted) that Routh had Hulbert sign a consent form to engage in sexual activity. Routh then taped Hulbert's mouth shut with duct tape so she was no longer able to use the safety word to stop Routh's conduct. Thereafter, Routh hand-cuffed Hulbert to a bed for several hours, bit her, strangled her, hit her, burned her, pulled her hair, caused her to bleed, caused her to become black and blue, put his hands over her mouth, and used foreign objects during sexual activity without her consent. Levy explained that the hearing Board decided Hulbert was incapable of giving her consent which violated the University's sexual assault policy.

## 2.  Whether Levy lied about Routh's ability to file a cross-complaint against Hulbert

Routh alleges that Levy lied to Routh and Manes about Routh's ability to file a cross-complaint against Hulbert. I asked all of the witness if they had any facts regarding this issue. Specifically, I asked them if they either participated in or heard any conversations with Levy, Routh, Manes, or others on this issue. I also asked if they had any relevant documents.

5

Levy recalled one conversation which occurred at the Staybridge Hotel regarding the cross-complaint issue. The conversation occurred at the hotel because Routh had already been suspended from the University and was not allowed on University property. At the time of the conversation, Routh had previously given a statement to University Security that acknowledged engaging in conduct harmful to Hulbert.

Levy informed me that Routh stated that since Hulbert also engaged in disorderly conduct, Hulbert should also be charged with a complaint. Therefore, Routh asked Levy to file a cross-complaint against Hulbert. Levy recalled replying in substance (she did not recall her exact words) that she will resolve the complaint against Routh first and she will later "evaluate" any claims she might have against Hulbert. Levy told me she was very clear that she did not say that Routh could not ever file a cross-complaint. Levy just said she would not consider it now. Levy summarized the cross-complaint issue for me by stating that she did not recall the exact words she used with Routh and Manes. However, she was sure she indicated to them that they could file a cross-complaint. However, she said she would not act on it then because she wanted to focus on the matter regarding Hulbert. The situation was too complicated at the present time and she wanted to focus on any potential cross-complaint after the hearing on the initial complaint (the one filed by Hulbert) was over. If Routh or Manes filed a cross-complaint in the future she would "evaluate" it.

I asked Levy what she would do if Routh or Manes filed a cross-complaint today. She stated she would "evaluate" it. She would still investigate the complaint and proceed forward as she would with any other complaint that came into her office. The statue of limitations has not run and she would "evaluate" and consider the complaint.

6

Levy also noted that Ecock was present at the Staybridge Hotel meeting. Ecock told me that she first met with Routh before the present matter due to his prior disciplinary history. Then, Ecock was the first to meet with Hulbert (Hulbert's female friend came to Ecock's office to complain that Routh was harassing both her and Hulbert. The next day the friend and Hulbert came back and filed separate written complaints). Hulbert decided to move forward, and the friend decided not to do anything more (the friend said she was scared).

On the cross-complaint issue, Ecock's recollection is generally consistent with Levy's. Ecock recalls Manes asking Levy if they (Manes and Routh) could file a charge against Hulbert and when can they do it? According to Ecock, Levy replied in substance (not an exact quote) that they can do it after this [the Routh] hearing. Levy explained that since Hulbert reported the complaint first, we will handle her matter first. However, you can bring your charge forward after this matter is over. Then Manes said either "okay" or she appeared generally satisfied.

I also asked Manes about her conversations with Levy on the cross-complaint issue. Significantly, Levy and Ecock's recollections of the conversations about the cross-complaint are not materially different from what Manes' told me on this key issue. Manes said her first conversation with Levy occurred at a meeting in Rochester prior to the disciplinary proceedings.[2] Manes stated Routh was with her and the conversation occurred "maybe at a hotel." She said her or Routh said to Levy in substance (not an exact quote) that since Hulbert was filing a complaint, and the behavior was consensual, she (Manes) wanted to make a cross-

---

[2] Manes stated that this meeting occurred sometime between October 24-25, 2011. We know that the meeting actually occurred in September - - before the September 29th hearing date.

7

complaint against Hulbert. Manes stated there was a complicity policy. She stated Levy told her generally (she did not recall her exact words) that she could not file a cross-complaint <u>at that time</u>. The matter against Routh must be resolved first. I asked if anyone else was at that meeting in addition to Manes, Routh, and Levy and she stated maybe Dean Ecock was around the corner during one of the conversations.

Manes told me she had a second conversation with Levy the morning of the expulsion hearing. The conversation occurred in Levy's office. Manes and Routh were sitting in Levy's office. Manes is not positive what words were used but she recalled generally that Manes or Routh asked Levy, if Routh is being expelled, what about Hulbert? She told me that once again she did not recall the exact words used but Levy said generally that Routh's violation of student policy justified his expulsion. Manes said Levy told Manes generally that Manes and Routh had no standing to file a cross-complaint. However, Levy said that after the conclusion of the process she (Levy) would look at the file and make a decision. She would then see if anything needed to be done. Manes did <u>not</u> recall her exact words but she felt like she was getting the "brush-off." Thus, even according to Manes, Levy did not say that Manes and/or Routh could not ever file a cross-complaint. Levy just said they could not file it <u>now</u>, and the matter against Routh must be resolved first. Levy would look at it again later and make a decision regarding a cross-complaint against Hulbert. I also asked Manes to send me any documents that might be relevant to the cross-complaint (or gender discrimination issue), but she never sent me any documents.

I asked Rick Crummins ("Crummins") if he talked with Levy about the cross-complaint issue. He said he had one conversation on the telephone wherein Levy denied telling Routh

8

and/or Manes that they could not ever file a cross-complaint. Levy explained that she only said they could not do it at that point in time.

I also talked to Sean Hanna ("Hanna") (Routh's Advisor) about the cross-complaint issue. Hanna stated he was at the Staybridge Hotel the Monday before the disciplinary hearing (but not in the meeting with Levy, Manes, and Routh). He recalled Manes generally bringing up the cross-complaint issue. He told her to try to focus on the case at hand (the case in which Routh was a respondent). He did not recall any other conversations regarding the cross-complaint issue.

I asked Dean Peter Lennie ("Lennie") whether he knew of any factual basis for the allegation that Levy lied (or not) regarding Routh and/or Manes' ability to file a cross-complaint against Hulbert. He stated he did not believe the facts demonstrated that Levy lied or that she had any motivation to lie. Routh and Manes had several other mechanisms at their disposal to pursue a cross-complaint and other grievance procedures. These were: (1) Routh and Manes could have gone to Levy's boss to complain about Levy and/or to make a direct complaint. There were plenty of layers above Levy where Routh and/or Manes could have complained. Lennie noted that Routh and Manes are not shy people and certainly could have pursued University grievance procedures further if they wanted to; (2) Routh and Manes knew they could have complained to Lennie and knew he was willing to hold up the expulsion appeal while they complained; (3) Routh and Manes appealed the expulsion decision; (4) Routh and Manes filed a federal court complaint; and (5) Routh and Manes could still file a cross-complaint if they wanted to. In fact, Lennie invited them to file a cross-complaint and yet they did not do so.

9

## 3. Gender Discrimination

Routh alleges that Levy's motivation to lie about the cross-complaint issue was based on illegal gender discrimination. During my interview with Manes, she stated she perceived a consistent attitude by Levy that Routh would not be judged fairly because he was male. Manes based her perception on the following: (1) Levy suspended Routh because she judged him to be a threat of violence; (2) Levy never treated Routh in a neutral way; (3) Levy made a decision to expel Routh - - the male student alone; (4) Levy made a decision to expel the male student after the female student retroactively withdrew her consent; (5) Levy had options and discretion; (6) Levy's attitude was always to "get Dylan"; and (7) Hulbert was a Resident Advisor ("RA"). Manes wanted to know what type of training Hulbert received from the University.

I asked several witnesses about these allegations. Levy denied taking gender into account and stated she did not consider the gender of the parties when deciding how to move forward with the complaint. She explained that Hulbert was the complaining party and Routh was the respondent and they were treated accordingly. Routh was found responsible because Hulbert was incapable giving her consent to several activities. In evaluating an appropriate response or sanction, Levy took into account the violent nature of the current incident and Routh's prior disciplinary history (knife possession). Levy stated she did not consider that Hulbert was a Resident Advisor ("RA") or that her father was a doctor at the University. Levy stated she did not even know of the latter two facts until the investigation was well under way nor would these two facts have impacted her decision.

10

I asked Hanna about Routh's allegation of gender discrimination. Hanna stated he never heard Routh, Manes, or anyone else make that accusation ("gender discrimination") in those words. However, he does recall Routh and Manes citing "the paternalistic manner" in which the University handled the case. Routh and Manes both expressed concern about Hulbert filing criminal charges against Routh. At some point they learned Hulbert had filed criminal charges against Routh. Then, Hanna suggested Routh's best course of action might be to end the expulsion hearing by withdrawing from the University. However, Routh and Manes wanted to move forward with the disciplinary hearing. They also expressed a belief that Hulbert should be charged with sexual assault and harassment. They cited the Code section 5a (Disorderly conduct, p. 2) which discusses assault and harassment. They also cited the Code's Complicity policy (p. 20). Hanna stated that he sympathized with Routh and Manes' understanding of the complicity policy as it related to the Code. However, he believed their interpretation of the complicity policy as it related to the Code was flawed.[3] Routh emphasized that Hulbert's acts were consensual. Hanna believed based on the evidence presented through the hearing process, that some of Hulbert's acts were consensual and some were not. Significantly, the fact that Hulbert had duct tape over her mouth and could not use the safety word were significant indicia that she could not consent at certain times. Hanna did not believe Levy's decision to charge Routh (the male) and not Hulbert (the female) was based on gender discrimination. He thought Levy's decision was based on her understanding of the Code. Hanna did not believe that the fact that Hulbert was an RA or her father was a doctor had any bearing on this matter.

---

[3] Hanna works in the University's College Center for Academic Support ("CCAS"). He told me he received training regarding the Code and other University procedures, and has sat in on approximately 50 hearings.

11

He thought most students at the University are involved in some aspect of campus life that makes them known to University administrators and the facts relating to Hulbert were immaterial.

I asked Ecock if she recalled any comments from any individual relating to gender discrimination. She said "no." I asked why Levy charged Routh (the male) without charging Hulbert (the female) in this matter. She said Levy did the correct, typical procedure. Hulbert was the complaining party. Levy also based her decision on the facts of the case. Ecock believes all proper procedures were followed and did not see any evidence of gender discrimination.

I asked Lennie about any conversations he had with Levy relating to the Complaint. He asked Levy two questions about the matter: (1) Why prosecute Routh and not Hulbert if Hulbert contributed to her own potential injury? Levy answered by stating that in instances where a student is at risk because of something they did to themselves, it is her (Levy's) practice to counsel the student, and not to charge the student; and (2) How well did the punishment fit the crime? Specifically, Lennie asked Levy about Routh's prior disciplinary history. Levy responded that if Routh's background only included the matter relating to Hulbert, Levy would only have suspended Routh. However, because Routh had a prior disciplinary history, Levy decided expulsion was appropriate. Lennie stated he was satisfied with Levy's response to his two questions.

12

## CONCLUSION

Routh alleges Levy lied to Routh and Manes about Routh's ability to file a cross-complaint against Hulbert. Routh also alleges Levy's motivation to lie was based on illegal gender discrimination.

I interviewed six individuals (my interview with the seventh witness -- Routh (the complainant) was cut short by Routh himself) and found no factual basis to support any of his claims. To the contrary, the evidence established the following: (1) Levy told Routh and Manes she did not want to entertain a cross-complaint at that time because she needed to focus on the Routh matter, but was willing to consider a cross-complaint later if Routh wanted to pursue it; (2) Levy's statements were consistent with my interviews of the other witnesses – including Ecock who was present during the first conversation about the cross-complaint with Routh and Manes at the Staybridge Hotel; (3) Most significantly, Levy's statements were generally consistent with the statement of Manes herself on the issue of the cross-complaint. Manes said that Levy told her she could not file a cross-complaint at that time because the matter against Routh must be resolved first. Manes also said Levy told her that after the conclusion of Routh's process, she would look at the file and make a decision (on the cross-complaint issue). Levy said she would decide later if anything needed to be done. While Manes was not happy with what Levy told her (Manes felt like she was getting the "brush off"), her statements were still consistent on the key issue of Levy only telling her she could not file a cross-complaint at that time; (4) The witness statements were also consistent with Levy's extensive options as the Judicial Officer under the Code. Levy has broad discretion as to when and if to charge a student; and (5) Levy also told me that Routh and/or Manes are still free to file a cross-

13

complaint. The statute of limitations has not run. If they file a cross-complaint today, Levy said she will "evaluate" it as she would with any other complaint that came into her office.

My investigation also found no factual basis to support a gender discrimination claim. Manes stated a number of reasons why she "perceived" or felt Routh was being discriminated against. However, Levy provided sound, non-discriminatory reasons for charging Routh and not Hulbert (Routh was the respondent, Routh had a prior disciplinary history, and the specific facts of this case). Other witnesses concurred that Levy complied with the Code and usual University policy, and saw no factual evidence of gender discrimination.

# EXHIBIT B

ARTS, SCIENCES AND ENGINEERING

Rochester Parents Fund



January 18, 2012

Ms. C. Renee Manes
4928 SE Tibbetts St
Portland, OR 97206-2261



Dear Ms. Manes,

Students are back at the University of Rochester after the holiday break and the campus is once again full of life! Our daughter, Anne, is very enthusiastic about returning to school for the second half of her senior year. It has been exciting to see her become more and more engaged through her studies and activities. We are very pleased with the experience that Anne has had at the University of Rochester.

As a vote of confidence for the University of Rochester and all students like our daughter, we participate in the Rochester Parents Fund, as we know many of you have as well. Through this unrestricted fund, we are able to support programs for students such as independent advanced research, study abroad, and academic support. Rochester Parents Fund gifts directly provide for the initiatives and state-of-the art resources that will allow current students to experience the same, unparalleled education that our children experienced.

**This year, we have a wonderful opportunity available to us as parents of seniors.** To commemorate your student's time at Rochester, you can create a lasting legacy in their name. Enclosed is a brochure that describes the details and contains an order form. By making a gift of $500 or more, a special paver engraved with the text of your choosing will be placed in Dandelion Square, a popular crossroads on campus – many parents engrave their child's name and graduation year. We are making this gift to honor the hard work and achievement of our daughter, Anne, at the University of Rochester, and we hope you will join us.

Thank you for considering a gift to the Rochester Parents Fund. If you have made a gift before, you know how much the students and faculty appreciate your help. Every gift—**whatever the size**—impacts our students and enhances the resources and opportunities they have, and also adds value to the diplomas they will carry with them when they leave Rochester. Congrats to you and your child!

Sincerely,

Lorrie W. Modica Esq. '81 P'12          Steven V. Modica Esq. P'12

P.S. In order for your paver to be installed by commencement, please return the registration form and your payment or go online at rochester.edu/giving/paver2012 to order and pay by **February 24, 2012.**

Alumni and Advancement Center · 300 East River Road · P.O. Box 270441 · Rochester, NY 14627-0441
585.276.3057 · 800.598.1330 · annualfunds@rochester.edu





# UNIVERSITY of ROCHESTER

Annual Giving Programs
www.rochester.edu/annualfunds

Alumni and Advancement Center
300 East River Road
P.O. Box 270441
Rochester, NY 14627



## A SENIOR TRADITION
## CLASS OF 2012

### CREATE A LASTING
### TRIBUTE TO YOUR GRADUATE.

The Rochester Parents Fund provides a unique opportunity
for families of graduating seniors to honor their students.



# YOUR SON OR DAUGHTER CAN LEAVE A UNIQUE MARK.

Congratulations to you and your family! Etched paver bricks are available to help you show pride in your senior student's accomplishments at the University of Rochester. These 4" x 9" bricks are custom etched and installed in Dandelion Square, just outside the Goergen Athletic Center. Help your special graduate leave his/her mark on campus with a senior paver.

**Gifts of $500 or more to the Rochester Parents Fund do more than provide a paver brick for your graduate. They also allow the Dean of the College to support many unique projects and programs at the University of Rochester.**

- The Parents Fund strengthens and deepens the academic experience for students by supporting programs like the Office of Undergraduate Research, the College Writing Program and the Center for Study Abroad.

- The Parents Fund enriches the co-curricular experience through funding for the College Readership Program and the Student Activities Office, which helps pay for student groups that travel to regional or national conferences and meetings.

- Your gift to the Parents Fund enhances campus life through improved services, technology, health and safety programs.

Your support of the Rochester Parents Fund represents a lasting tribute to your student and a commitment to helping the College become ever better.

To participate in this special opportunity only available to the families of seniors, please complete the enclosed form and return it with your gift of $500 or more to the Annual Giving Programs Office in the envelope provided.

## Why Wait?

To ensure that your paver brick is installed by commencement weekend, please return your information by February 24, 2012. If you have any questions, contact Darlene Schuler at **800.333.0175** or **dschuler@alumni.rochester.edu**.

# DANDELION SQUARE BRICK REGISTRATION FORM.

A SENIOR
TRADITION
CLASS OF 2012

**Please Print** your inscription: limited to 14 characters per line (including spaces and punctuation), with a maximum of 3 lines.

Line One

Line Two

Line Three

Signature

Date

Name (Please Print)

Address

City                    State        Zip

Daytime Telephone

E-Mail Address

Please return this form in the envelope provided by **February 24, 2012** to ensure brick production and installation by graduation.